UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MAIN STREET AMERICA
ASSURANCE COMPANY,

        Plaintiff,

v.

NORTHEAST PROPERTY MAINTENANCE, SHANE
CARPENTER, JOSHUA WARNER and MICHELLE
WARNER,

        Defendants.
_____

1:23-cv-1096
(ECC/DJS)

Troy S. Flascher, Esq., *for Plaintiff*
Gregory J. Teresi, Esq., *for Defendant Shane Carpenter*

**Hon. Elizabeth C. Coombe, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

On August 28, 2023, Plaintiff Main Street America Assurance Company (MSAAC) initiated this action seeking declaratory judgment pursuant to 28 U.S.C. § 2201 regarding the parties' rights and obligations under an insurance policy that MSAAC issued to Defendant Northeast Property Maintenance (NPM). Compl., Dkt. No. 1. Specifically, MSAAC asserts that it has no obligation to defend or indemnify NPM, Joshua Warner, or Michelle Warner in an underlying state court personal injury action against them. *Id.* Presently before the Court is MSAAC's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 19. Defendant Carpenter filed an opposition to the motion, and MSAAC

filed a reply.[1]  Dkt. Nos. 22, 27.  For the following reasons, the motion for summary judgment is granted.

I.   FACTS

   A.   Local Rule 56.1(b)

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b).  This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 525 F. Supp. 3d 305, 320 (N.D.N.Y. 2021) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. 2019)).  "A proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 525 F. Supp. 3d at 320 (quoting *Alke v. Adams*, 16-cv-0845, 2018 WL 5297809, at *2 (N.D.N.Y. Oct. 25, 2018)).  "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

Here, Defendant Carpenter's response to MSAAC's Statement of Material Facts fails to comply with the requirement in Local Rule 56.1(b), which states that each fact shall be

---

[1] Defendants Northeast Property Maintenance, Joshua Warner and Michelle Warner have not appeared in this action.

2

"admit[ted]" or "den[ied]," and that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b).  Instead, Carpenter filed a competing Statement of Material Facts with citations to the record, as typically seen in state court practice. In the interest of deciding this matter on the merits, the Court has undertaken the task of comparing the parties' Statements of Material Facts in order to determine which facts are disputed and which are not.

### B. Relevant Background and Facts[2]

#### 1. The Policy

MSAAC issued Businessowners Policy No. MPU5452T (the Policy) to NPM with effective dates of April 4, 2020 to April 4, 2021.  Dkt. No. 19-1 ¶ 32, *see also* Ex. H, Dkt. No. 19-9.  The Policy Declarations list NPM as the Named Insured, Dkt. No. 19-1 at ¶ 33, Ex. H at 13,[3] and identify the Form of Business as "Individual," *id.* ¶ 34, Ex. H at 13.  With respect to coverage, the Policy provides, in pertinent part, as follows:

> 1. Business Liability[ ]
>
>  a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury", to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

---

[2] The facts are drawn from MSAAC's Statement of Material Facts, Dkt No. 19-1, and Defendant Carpenter's competing Statement of Material Facts, Dkt. No. 22-2, to the extent the facts are well-supported by citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Defendants as the non-moving parties. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[3] Page citations are in reference to the pagination generated by ECF, unless otherwise noted.

3

*Id.* ¶ 35, Ex H at 19. As relevant to this action, the Policy further states that certain damages are excluded from coverage:

> g. Aircraft, Auto Or Watercraft
>
> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".
>
> This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

*Id.* ¶ 36, Ex. H at 23.

### 2. The Personal Injury Action

#### a. The Underlying Complaint

On February 2, 2021, Defendant Carpenter commenced a personal injury action against Joshua Warner, Michelle Warner, and NPM in New York State Supreme Court, in connection with an accident that occurred on May 13, 2020 (Underlying Action). Dkt. No. 19-1 Ex. A (Underlying Compl.) ¶ 6. The allegations set forth in in the Underlying Action are as follows.

NPM was a landscaping business with its principal place of business located at 5491 State Route 40, Argyle, New York (the Premises). Underlying Compl. ¶ 4. Joshua Warner and Michelle Warner (collectively, the Warners) were the owners and operators of NPM, and Carpenter was an employee and/or agent of NPM, at all times relevant to the Underlying Action. *Id.* ¶¶ 5, 8. On May 13, 2020, Carpenter and another employee of NPM, Dan Dean, were operating a pickup truck at a jobsite during which time the truck became immobile. *Id.* ¶¶ 11-13. The Warners owned the truck, and NPM used it for landscaping and property maintenance. *Id.* ¶¶ 6, 7, 20-22. Dean

4

proceeded to "fix" the truck, and Joshua Warner (Warner) was "apprised" of the problem. *Id.* ¶ 14.

At approximately 8:00 p.m. that day, Carpenter parked the truck in the driveway of the Premises, "i.e. the Warner's property." Underlying Compl. ¶¶ 15, 16. After Warner offered to physically show Carpenter why the truck had become immobile earlier in the day, Carpenter and Warner crawled under the truck and were "laying on their backs to observe the underside of the truck. *Id.* ¶¶ 20-21. Specifically, "Warner was showing Carpenter a mechanical issue with the rear differential of the" truck. *Id*. At that time, "Warner negligently touched a part on the truck, which caused the truck to shift out of gear and caus[ed] Carpenter to be stuck under the vehicle and dragged approximately 37 feet before being run over by the truck." *Id.* ¶ 22. Carpenter sustained serious injuries as a result of the accident. *Id.* ¶ 25.

### b.      Relevant Deposition Testimony

Several parties and non-parties to this action were deposed in connection with the Underlying Action. The witnesses elicited the following testimony, as relevant to the pending motion.

### i.      Joshua Warner

In 2004, Warner "started" NPM, a lawncare, landscaping, and snow plowing business. Dkt. No. 22-3 (Warner Dep.) at 16.[4] He did not operate the business between 2013 and 2015, however he "restart[ed]" the business in 2015. *Id.* at 18, 20. The Warners reside at 5491 State Route 40, where the underlying accident took place. *Id*. at 5-6.

---

[4] It appears MSAAC intended to attach Warner's deposition transcript to its motion, *see* Dkt. No. 19-1 ¶ 9, however the transcript was left out of the exhibits submitted to the Court via the electronic filing system, *see* Dkt. No. 19-4.

5

Carpenter began working as a laborer for NPM in April 2020. Warner Dep. at 28-29. On May 13, 2020, Carpenter and another laborer, Dan Dean, drove Warner's truck to a work site. *Id.* at 39. Warner and another employee drove separately to the same worksite, where they all worked for approximately six hours. *Id.* at 39-40. Warner and the other employee eventually left the worksite, while Carpenter and Dean finished shoveling leftover stone dust into the trailer hitched to the truck. *Id.*

Later that evening, Dean drove the truck and trailer back to Warner's home, with Carpenter. Warner Dep. at 42-43. As Dean was backing the truck and trailer into Warner's driveway, Warner heard the truck revving, and noticed that it was disabled at the bottom of the driveway. *Id.* at 43-44. When Warner approached the truck, Dean stated that the vehicle wasn't moving and that a cable underneath had come off that morning. *Id.* at 45-46. Dean indicated that they (Carpenter and Dean) had addressed the problem earlier by climbing underneath the truck and popping the cable back on. *Id.* at 46. Warner climbed underneath the truck, observed the cable had fallen off again, and reinstalled the cable. *Id.* at 49-50. Warner then got into the truck and "backed it up to the top of the driveway," where he parked the truck and turned it off. *Id.* at 50-51.

Warner got out of the truck and was "freaking out" on Carpenter and Dean for not notifying him about the problem earlier. Warner Dep. at 51-52. Warner went back underneath the truck to "further inspect what was really going on[.]" *Id.* at 52. At the same time, Dean was "taking the trailer off" the truck. *Id.* As Warner was "looking at the problem," Carpenter appeared next to him underneath the truck. *Id.* at 52. Warner "point[ed] to the problem," and Carpenter "reache[d] up," when, in the "blink of an eye," the trailer popped off the hitch. *Id.* at 52-53. The back end of the truck rose approximately four inches, and then the truck "started going down the hill." *Id.* at 53. Warner pulled himself out from under the truck, but Carpenter "went in the fetal position"

6

under the truck, and was "dragged . . . from the top of the driveway to 37 feet down where it spit him out[.]" *Id.* at 53-54, 59.

### ii.     Shane Carpenter

On May 13, 2020, Carpenter and Dean took Warner's truck to various job sites throughout the day. Dkt. No. 22-4 (Carpenter Dep.) at 56-57. At the end of the day, Carpenter drove the truck back to Warner's house. *Id.* at 60-61. Carpenter backed the truck, with attached trailer, up the "big hill," and Dean disconnected the trailer. *Id.* at 61-62. Carpenter was still in the truck when Dean disconnected the trailer, and once it was disconnected Carpenter moved the truck forward "not even two feet." *Id.* Dean then mentioned to Warner that the truck had an issue, specifically with coming out of gear. *Id.* at 63-64. Warner "went under" the truck to look at the problem. *Id.* at 61. Warner told Carpenter that he believed the issue was the "shifter linkage," and Carpenter told Warner to "show [him]" . . . "what the issue was in case it happened while [Carpenter] was with the vehicle." *Id.* at 65-66. Carpenter went under the truck approximately 30 seconds after Warner. *Id.* at 69. While they were both underneath the truck, Warner "pointed out the part that he was speaking of . . . and he touched it[.]" *Id.* at 69-70. As soon as Warner "touched something," the truck started rolling. *Id.* at 70. Carpenter was dragged down the hill beneath the truck approximately 40 feet, at which time he "came loose." *Id.* at 71-72.

### iii.     Danyal Dean

Sometime prior to May 13, 2020, Dean and Carpenter were unloading leaves from the trailer attached to Warner's truck at their usual "dump spot," when the truck "either . . . came out of gear or something happened with the truck . . . and it just would not move." Dkt. No. 22-7 (Dean Dep.) at 26-27. Dean "looked underneath" the truck, but did not see anything hanging from it. *Id.* He reported this observation to Warner. *Id.* Dean could not recall how they ultimately got the truck out of the dump spot. *Id.* at 27.

7

On May 13, 2020, Carpenter and Dean drove back to Warner's home at the end of the workday. Dean Dep. at 28. Carpenter was driving, and ultimately backed the truck up Warner's driveway to the garage, where Dean and Carpenter unloaded their tools. *Id.* at 28-29. Once the tools were unloaded, Carpenter further backed up the truck and trailer to the side of the garage. *Id.* Dean unhooked the trailer as Carpenter was getting out of the truck. *Id.* at 30. Warner was "just standing there." *Id.* at 30-31. The truck was parked and not running. *Id.* at 31.

Eventually, Warner spoke to Carpenter and Dean about "something on the truck," and then Warner was underneath the truck. Dean Dep. at 32-33. Carpenter "got underneath it with [Warner] looking at the same part." *Id.* Dean assumes that Warner "hit something underneath on the transmission," because suddenly "the whole truck[ ] [was] going down the driveway." *Id.* at 33. Dean observed Warner "get out from underneath the truck as soon as it started rolling," but the truck was half-way down the driveway before he saw Carpenter "come out from underneath" it. *Id.* at 41-42.

## II.    STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by showing that the nonmoving party has " 'fail[ed] to make a showing sufficient

8

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party has "'failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## III. DISCUSSION

MSAAC argues, among other things, that the Aircraft, Auto or Watercraft Exclusion in the Policy (the Auto Exclusion) relieves it from having to cover the injuries alleged in the Underlying Action. Plaintiff's Memorandum of Law (Pl. MOL) at 8-12, Dkt. No. 19-10. Specifically, MSAAC argues that the unambiguous terms of the Auto Exclusion apply notwithstanding the differing versions of the underlying events and, thus, summary judgment should be awarded. *Id.*; *see also* Plaintiff's Reply Memorandum of Law at 6-16, Dkt. No. 27. In response, Defendant Carpenter argues that summary judgment should be denied because (1) the terms of the Auto Exclusion are ambiguous, (2) the motion is premature due to "unresolved" facts as to what caused the truck to roll down the driveway, and (3) regardless of the unresolved factual issues, Carpenter's injuries were not proximately caused by the "use" or "maintenance" of the truck. Defendant Carpenter's Memorandum of Law (Def. MOL) at 6-11, Dkt. No. 22. For the following reasons, the Court finds that MSAAC is entitled to summary judgment, and is not obligated to defend or indemnify NPM or the Warners[5] in the Underlying Action due to the applicability of the Auto Exclusion.

The parties agree that New York law applies to the interpretation of the Policy. "Under New York law, an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." *Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 49 F.4th 105, 112 (2d Cir. 2022). "The initial interpretation of a contract is a matter of law for the court to decide, as is the threshold question of whether a contract is ambiguous." *Id.* "[I]nsurance contracts [must] be interpreted according to the reasonable expectation and purpose of the ordinary

---

[5] In light of the Court's finding as to the applicability of the Auto Exclusion, it need not assess MSAAC's alternative basis for summary judgment, i.e. whether the Warners are insureds under the policy. Pl.'s MOL at 5-8.

10

businessman when making an ordinary business contract." *Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451 (2005).

Exclusions "are subject to strict construction and must be read narrowly." *Auto. Ins. Co. of Hartford*, 818 N.Y.S.2d 176, 176 (2006); *see also U.S. Specialty Ins. Co. v. LeBeau, Inc.*, 847 F. Supp. 2d 500, 504 (W.D.N.Y. 2012) ("[E]xclusionary clauses in which the insured had little or no input are to be strictly construed against insurers.") (citing *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361 (1974)). "[T]o negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon." *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006). "Under New York insurance law, the burden, a heavy one, is on the insurer, and if the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Id.* However, "unambiguous provisions must be given their plain and ordinary meaning." *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 753 (2d Cir. 2023) (citations omitted).

Accordingly, "[t]he Court must first decide, as a threshold matter, whether the exclusion at issue is unambiguous as a matter of law." *City of New York v. W. Heritage Ins. Co.*, 98 F. Supp. 3d 557, 563 (E.D.N.Y. 2015) (citing *Parks Real Estate Purchasing Grp. v. St. Paul Fire and Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir. 2006) ("[T]he initial interpretation of a contract is a matter of law for the court to decide.") (internal quotation marks and citation omitted)). The Auto Exclusion bars coverage for bodily injury "arising out of the ownership, maintenance, use or entrustment to others of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured."

11

Consistent with other courts that have addressed virtually identical automobile exclusions, the Court finds this language to be "clear and unambiguous and allow[s] no opportunity for construction as a question of fact." *Western Heritage Ins. Co.*, 98 F. Supp. 3d at 563, *see also Am. Eur. Ins. Co. v. Tirado Iron Works & Fence, Inc.*, No. 19-cv-6851, 2021 WL 7830143, at *7 (E.D.N.Y. Oct. 20, 2021) (report and recommendation) ("New York state and federal courts have found automobile exclusions, similar to the one at issue here, to be unambiguous") (collecting cases); *Nautilus Ins. Co. v. 93 Lounge Inc.,* No. 14-cv-01029, 2017 WL 1207528, at *7 (E.D.N.Y. Mar. 31, 2017) (finding similar exclusion to be "unambiguous and that the 'ordinary business man' would have interpreted the Policy to exclude claims for bodily injuries arising out of the use of an automobile.") (collecting cases).

Because the Court finds the provision in question to be unambiguous, it must interpret it in light of its "plain and ordinary meaning." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011) (quoting *Essex Ins. Co. v. Laruccia Constr., Inc.*, 71 A.D.3d 818, 898 (2d Dept. 2010)). As relevant to this analysis, "[i]t is well settled under New York law that the term 'arising out of' is afforded a broader meaning in the context of general liability insurance than the term 'caused by,' and that 'a liability policy exclusion which excludes injuries arising out of the ownership, maintenance, or use of a motor vehicle' will extend to any injuries 'originating from, incident to, or having a connection with the use of the vehicle.'" *LeBeau, Inc.*, 847 F. Supp. at 506 (quoting *Liberty Mutual Ins. Co. v. E.E. Cruz & Co., Inc.*, 475 F. Supp. 2d 400, 409 (S.D.N.Y. 2007)); *see also Merritt Env't Consulting Corp. v. Great Divide Ins. Co. & Berkley Specialty Underwriting Managers,* No. 17-cv-7495, 2018 WL 6168180, at *1 (E.D.N.Y. Nov. 26, 2018).

Here, Defendant Carpenter's injuries fall squarely within the category of injuries "arising out of the maintenance [or] use" of Warner's truck. It is undisputed that Warner went underneath the truck, and Carpenter followed, to address an issue with the transmission. Warner Dep. at 26, 55; Carpenter Dep. at 65-66. Warner testified that he did not fully understand the nature of the problem before going under the truck with Carpenter, but that if it was a "quick fix," he "could have fixed it." Warner Dep. at 55. It was not until he was underneath the truck that he realized the situation was "bad," and there was "nothing [he] could do." *Id.* Thus, regardless of whether the truck began to roll down the driveway because (1) Warner touched something underneath it, or (2) Dean removed the trailer from the hitch, Carpenter's injuries were nonetheless sustained in the course of the use and/or maintenance of the vehicle. *See Country-Wide Ins. Co. v. Excelsior Ins. Co.*, 147 A.D.3d 407, 409 (2017) ("[T]he focus of the inquiry 'is not on the precise cause of the accident but the general nature of the operation in the course of which the injury was sustained.'") (quoting *Regal Constr. Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 15 N.Y.3d 34 (2010), quoting *Worth Constr. Co., Inc. v. Admiral Ins. Co.,* 10 N.Y.3d 411, 416 (2008)).

Defendant Carpenter urges the Court to find the Auto Exclusion inapplicable to the underlying accident. Carpenter first argues that the "mere involvement of a vehicle in an accident does not automatically mean that the injury arose from the 'use' of the vehicle under an insurance policy's exclusion." Def. MOL at 8-9. The Court agrees with this general premise. "Generally, the determination of whether an accident has resulted from the use or operation of a . . . vehicle requires consideration of whether, inter alia, the accident arose out of the inherent nature of the vehicle and whether the vehicle itself produced the injury" *Great Am. E & S Ins. Co. v. Hartford Fire Ins. Co.*, No. 09 Civ. 10010, 2012 WL 3186086, at *7 (S.D.N.Y. Aug. 3, 2012), *report and*

13

*recommendation adopted*, 2012 WL 13070158 (S.D.N.Y. Aug. 31, 2012) (quoting *Eagle Ins. Co. v. Butts*, 269 A.D.2d 558, 558–559 (2000) and *U.S. Oil Ref. & Mktg. Corp. v. Aetna Cas. & Sur. Co.*, 181 A.D. 2d 768 (1992)).  The cases Carpenter relies on as controlling, however, involve injuries primarily sustained by something other than the subject vehicle, and/or for reasons entirely unrelated to its inherent nature.  *See, e.g., RLI Ins. Co. v. Premier Coach, Inc.*, 2008 U.S. Dist. LEXIS 7370, at *11 (S.D.N.Y. Jan. 25, 2008) (injuries sustained during physical assault on bus, during the course of which bus door was closed on injured party's arm); *Great Am. E&S Ins. Co. v. Hartford Fire Ins. Co.*, 2012 U.S. Dist. LEXIS 108638, at *23 (S.D.N.Y. Aug. 3, 2012) (injuries sustained by workers when crane fell onto trucks being used as stationary work platforms).[6]  Here, the truck was not merely the happenstance site at which Carpenter sustained injuries, brought about by some external source.  Carpenter's injuries were produced by the truck when it dragged him down the driveway, and arose out of Carpenter and Warner's conduct while addressing the truck's ongoing mechanical issues.  *Compare* W*illiams v. Nationwide Mutual Insurance Co.,* 269 N.C. 235 (1967) (injuries sustained when the owner of the vehicle removed a front wheel, causing the car to fall onto the plaintiff who was underneath making repairs, arose from maintenance of vehicle for purposes of coverage), *with Cent. New York Reg'l Transp. Auth. v. Burlington Ins. Co.*, 2016

---

[6] Throughout their briefs the parties cite to, and make no distinction between, cases interpreting auto carrier policies providing coverage for injuries arising out of the use and/or maintenance of a vehicle, and general liability policy exclusions precluding coverage for injuries arising out of the use and/or maintenance of a vehicle.  Courts have recognized that there is no reason to construe these phrases any differently, because "the purpose of an auto exclusion in a commercial general liability insurance policy is to preclude liability for losses that would be covered under the 'mirror image' insuring agreements found in automobile liability policies – the auto coverage 'picks up' where the commercial general liability coverage 'leaves off.'" *Cent. New York Reg'l Transportation Auth. v. Burlington Ins. Co*., No. 5:15-cv-22, 2016 WL 6781470, at *6 (N.D.N.Y. Sept. 7, 2016) (citations omitted); *see also United Servs. Auto. Ass'n v. Aetna Cas. & Sur. Co.*, 75 A.D.2d 1022 (4th Dep't 1980) ("To construe these identical phrases differently would leave open the possibility that some occurrences could escape coverage on both policies.).

WL 6781470, at *6 (declining to preclude coverage under exclusion where individual was tased by a police officer while riding a bus, because "there is no causal relationship between the 'auto' itself and the incident described in the complaint."); *Allstate Ins. Co. v. Staib*, 118 A.D.3d 625, 626 (1st Dep't 2014) (injuries did not arise out of "ownership, maintenance or use" of auto where dog sitting in parked vehicle bit child as she walked by, because the vehicle itself did not produce the injury, nor did the accident arise out of the inherent nature of the vehicle.") (citations omitted).

Carpenter further argues that the activities precipitating his injuries were limited to an "inspection" of the truck, and did not amount to "maintenance" as contemplated by the Auto Exclusion. Def. MOL at 10. "To maintain" has been defined in the insurance policy realm as to "preserve or keep in an existing state or condition and embraces acts of repair and other acts to prevent a decline, lapse, or cessation from that state or condition." 7 Am. Jur. 2d Automobile Insurance § 146. New York courts further define maintenance in this context as performance of work on "an intrinsic part of the mechanism of the car and its overall function." *Guishard v. Gen. Sec. Ins. Co.*, 9 N.Y.3d 900 (2007). New York courts have recognized that maintenance includes changing a tire, *Pennsylvania Millers Mut. Ins. Co. v Manco*, 63 N.Y.2d 940, 942 (1984), however does not extend to "riveting metal to a van in furtherance of its conversion to an ice cream truck," *Guishard v. Gen. Sec. Ins. Co.*, 9 N.Y.3d at 902. Courts in other states have expanded on what constitutes the maintenance of a vehicle under similar policy language. *See, e.g., In Williams v. Nationwide Mutual Insurance Co.,* 269 N.C. 235 (1967) (making repairs underneath a vehicle); *Meridian Mut. Ins. Co. v. Purkey*, 769 N.E.2d 1179, 1184 (Ind. Ct. App. 2002) (siphoning gasoline from the tank of a vehicle to facilitate the repair of a leak); *Krempl v. Unigard Sec. Ins. Co.,* 69 Wash. App. 703, 709 (1993) (installing a "jerry-built" temporary fuel supply so that the vehicle would run, and attempting to remove the tank when it burst into flames).

Here, Carpenter's suggestion that the activities surrounding the underlying accident were merely an inspection of the truck overlooks Warner's admission that he was going underneath the vehicle was to repair the problem "if it could be fixed." Warner Dep. at 55. In fact, Warner testified that after Carpenter was transported to the hospital, Warner "got [the truck to a state] where it would drive [to the mechanic's shop]." *Id.* at 57. Whether the mechanical issue was actually repaired is not relevant to this Court's ultimate inquiry, nor is it material that Warner and Carpenter did not have tools with them when they went under the truck. Carpenter's argument "ignores the fact that many acts of maintenance involve a series of steps, some of which may be categorized as 'preliminary' and/or 'diagnostic.'" *Meridian Mut. Ins. Co. v. Purkey*, 769 N.E.2d 1179, 1184 (Ind. Ct. App. 2002). Accordingly, Carpenter has failed to raise a material question of genuine fact as to this issue.

Moreover, even if the Court were to accept Carpenter's more limited definition of what constitutes maintenance in this context, Carpenter fails to establish how Warner's attempt to address the mechanical issue contributing to the truck's malfunctioning did not otherwise constitute the "use" of the vehicle. *See, e.g., Gering v. Merchants Mut. Ins. Co.*, 75 A.D.2d 321, 323 (1980) (concluding that "attempt[ ] to perform an emergency repair" was "not maintenance, in the sense of periodic checks and repairs performed in order to keep the vehicle in proper condition and good working order, but was directly connected with the continued 'use' of the vehicle.").

Finally, the Court rejects Carpenter's argument that, even if the "activities involved" constituted "use" of the vehicle, Plaintiff has failed to meet its burden because it "cannot demonstrate that the proximate cause of the injuries directly arises from the use of the vehicle."

16

Def. MOL at 9. The Second Circuit continues to recognize that the phrase "arising out of" requires something less than proximate cause:

> . . . the phrase "arising out of" means "originating from, incident to, or having connection with." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (internal quotation marks omitted) (defining "arising out of" under New York law). " '[A]rising out of' . . . requires only that there be some causal relationship," *Maroney v. N.Y. Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (2005), and does not mean "proximately caused by," *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 29 N.Y.3d 313, 324 (2017) (internal quotation marks omitted). *See id.* (contrasting "arising out of," which "is not the functional equivalent of proximately caused by," with "caused, in whole or in part," which does require proximate cause; and citing the Texas Supreme Court's "similar distinction," under which "arise out of means that there is simply a causal connection or relation, which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation" (internal quotation marks omitted)); *see also Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.*, 459 N.Y.S.2d 158, 161 (4th Dep't 1983) ("The words 'arising out' of have broader significance than the words 'caused by.' " (internal quotation marks omitted)).

*Ameriprise Captive Ins. Co. v. Audatex N. Am., Inc.,* No. 23-957, 2024 WL 2350315, at *2 (2d Cir. May 23, 2024). Thus, even if the underlying injuries were not proximately caused by the use and/or maintenance of the truck, Carpenter has failed to raise a genuine issue of material fact disputing that his injuries were sustained in connection with such activities.

Regardless of which version of the underlying facts are accepted by the Court for the purposes of adjudicating the instant motion, it is undisputed that Warner and Carpenter were underneath the truck in order to address an on-going mechanical issue. Therefore, there is no dispute that Carpenter's injuries – sustained when the truck was caused to roll down the hill while he was still underneath it – arose from the use and/or maintenance of the truck. For these reasons, the Court finds that the plain terms of the Auto Exclusion preclude coverage under the Policy.

### IV.    CONCLUSION

For these reasons, it is hereby

17

**ORDERED** that MSAAC's motion for summary judgment pursuant to Rule 56, Dkt. No. 19, is **GRANTED**; and it is further

**ORDERED** that pursuant to the terms of the Policy, including the Auto Exclusion, MSAAC is not obligated to defend or indemnify NPM, Joshua Warner, or Michelle Warner for the claims and damages asserted in the Underlying Action by Shane Carpenter; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment accordingly and close this action.

**IT IS SO ORDERED.**

Dated: March 12, 2025

Elizabeth C. Coombe
U.S. District Judge